UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENYA HUSTON,

      Plaintiff,

v.

AUTOKINITON, d/b/a TOWER
INTERNATIONAL, INC.,

      Defendant.

_____ /

Case No. 23-13070

Hon. F. Kay Behm
United States District Judge

**OPINION AND ORDER ON DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 29)**

## I.    PROCEDURAL HISTORY

This matter is before the court on Defendant's motion for

summary judgment (ECF No. 29).  Plaintiff Kenya Huston brings

claims of disability discrimination and failure to accommodate,

retaliation, and racial discrimination against Defendant Tower

Automotive Operations USA I, LLC d/b/a Autokiniton.[1]  A companion

---

[1] Defendant is incorrectly identified in the case caption as Autokiniton d/b/a
Tower International, Inc.

case was brought in *Williams v. Autokiniton* (Case No. 23-12404), and the arguments on both cases were consolidated.[2]

Specifically, Huston brings retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and Michigan Elliott-Larsen Civil Rights Act ("ELCRA"), ADA and Michigan Person with Disabilities Act ("PWCRA") disability discrimination claims, ADA and PWCRA failure to accommodate claims, a § 1981 retaliation claim, and a ELCRA race discrimination claim.  ECF No. 1.

The motion is fully briefed, and the court heard argument on this and the related case on September 17, 2025, at which counsel for both parties were present.  For the reasons explained below, the court **GRANTS** Defendant's motion for summary judgment **IN PART** as to Counts I, II, III, V, XIII, and IX, but **DENIES** the motion as to Plaintiff's failure to accommodate claims (Counts VI and VII).

## II.    FACTUAL BACKGROUND

---

[2] Because they are related cases and share some overlapping facts, the parties sometimes present deposition testimony taken in the other case.  Neither party objects to the use of the depositions in that way, and the court generally accepts their admissibility for use in either case for purposes of these motions.

Autokiniton is an automotive stamping and assemblies supplier and builds automotive frames.  ECF No. 38-1, PageID.1693.  On September 20, 2022, Autokiniton hired Kenya Huston as a Production Operator ("PO") in Plymouth, Michigan.  ECF No. 29, PageID.236.  The first 90 days of her employment were a probationary period, during which Defendant could terminate Plaintiff at any time, without just cause.  ECF No. 29-5, PageID.286 (offer letter); ECF No. 29-7, PageID.329 (CBA, Article 16) ("New employees shall not have seniority and shall be subject to discharge with or without cause (and without recourse to the Grievance Procedure/Arbitration processes set forth hereinafter) during a probationary period of the first ninety (90) calendar days from their respective individual date of hire").  As a PO, Plaintiff was not permanently assigned to work any specific line or job area, but rather was assigned to various positions within a line or job area as needed to meet production needs and was allegedly required to move around as needed, which included the ability to work in any area that had lifting requirements.  ECF No. 29, PageID.237.[3]

---

[3] Huston "denies" this, but setting aside the issue of reasonable accommodations for employees with disabilities, points to no facts that genuinely

Plaintiff alleges she has a medical condition resulting from a car accident in August 2022 that prevents her from lifting her arm up or turning her neck quickly without pain. *Id.* Defendant and Plaintiff disagree the extent to which this affected and continues to affect her day-to-day life and activities. *Compare* ECF No. 29, PageID.237 ("Plaintiff was able to drive, care for herself and perform some household cleaning."), *with* ECF No. 38, PageID.1492 ("Plaintiff testified to her inability to lift her arms over her head, turn her head quickly, or run when she started working for Defendant. She also testified that she needed her daughter to complete most household chores and even help wash her back when bathing.") (citations omitted); *see* ECF No. 29-6, PageID.305 (relevant portion of Huston Dep.).

However, Plaintiff provided Autokiniton with documentation from her physician at Modern Pain Management dated September 19, 2022 ("9/19/22 Note"), to Defendant's HR Generalist Kim Gault, which stated that Huston had "no restrictions." ECF No. 29-12, PageID.415. Plaintiff alleges that she only provided this note under a form of

---

dispute the evidence that POs without restrictions can generally be reassigned to various positions that may involve lifting. *See* ECF No. 38, PageID.1492. The court elsewhere explains why Defendant, for its part, has also not produced sufficient evidence to show that this was an "essential" requirement of the job.

economic duress.  Huston says she was told by Gault that Autokiniton would not let Plaintiff work if she did not have a note with cleared restrictions, so she requested a doctor's note (against her doctor's advice) without restrictions so that she could earn a paycheck.  ECF No. 38, PageID.1493.  Plaintiff never provided any medical documentation indicating restrictions on lifting during the period she worked at Autokiniton.  And Defendant says that prior to her termination, Plaintiff never requested an accommodation supported by medical documentation.  ECF No. 29, PageID.238.

On October 28, 2022,[4] a supervisor (Willie Kennedy) sent two employees, including Plaintiff, to a short-staffed area (Constellium Rails or "CR") where they needed assistance with placing 15-pound rails on racks for painting and then into shipping racks.  *Id.*[5]  So when

---

[4] At least once, Plaintiff refers to the relevant date as October 22.  *See* ECF No. 38, PageID.1493.  But no evidence links October 22 to the events of this case and the court assumes a mistake.

[5] Plaintiff "denies" all of this, but Plaintiff a) does not actually dispute that she was sent there, and b) her supposedly contrary evidence does nothing to dispute the evidence presented by Defendant.  Autokiniton cites the supervisor's testimony that the area was short-staffed.  *See* ECF No. 29-14, PageID.426.  Plaintiff cites her own testimony that she did not recall whether the supervisor said the area was short staffed.  ECF No. 38-1, PageID.1558.  Huston "may not create a dispute of fact concerning an issue about which [s]he has no recollection."  *Pratt v. Brown Mach. Co., Div. of John Brown, Inc.*, 855 F.2d 1225, 1233 (6th Cir. 1988).

Plaintiff arrived at the area, the supervisor in that area (Thomas Mosher) instructed her to place rails on racks.  Plaintiff asked Mosher if she had to rack the rails, and he responded that she did.  ECF No. 29, PageID.238.  Plaintiff, however, refused to rack rails.[6]  Here the parties diverge slightly on what happened.  Defendant says Huston walked away entirely, in the direction of the cafeteria, and never returned to CR that day (ECF No. 29, PageID.239); Plaintiff does not dispute that she walked away from the CR area, but says she went to work at her previous station after speaking with another supervisor, Torrae Rucker.  ECF No. 38, PageID.1495 (citing Huston Dep. at ECF No. 38-1, PageID.1532).[7]

Defendant says Plaintiff's walking off work at the CR area was insubordination because Huston never told the supervisor about her

---

[6] Again, Plaintiff "denies" this, but does not actually dispute that Plaintiff did not rack rails, walked away, and did not return to that area.  ECF No. 38, PageID.1495.

[7] There is some disagreement in the record about how long it took Huston to check in with Rucker.  Huston says it took 30-40 minutes to check in and get a new assignment.  ECF No. 38-1, PageID.1545.  Huston later stated that Autokiniton cited a two-hour period that she was allegedly missing as a factor in her termination.  *See* ECF No. 38-1, PageID.1689 (EEOC charge).  Defendant here focuses their argument only on the fact that Huston left the CR area without authorization; they do not argue that she was also missing from work for two hours, so the court takes Huston's word for it.

alleged inability to lift or that she had lifting restrictions.  ECF No. 29, PageID.239.  Plaintiff says the opposite; she says she told Mosher (the supervisor) that she could not lift the items.  ECF No. 38-1, PageID.1558.  Defendant says that Plaintiff refused to do the work not because she could not lift the items but because she, in her words, views it as a man's job.  ECF No. 38-1, PageID.1529-30.  Huston argues that those observations referred to what other people said.[8]

On November 1, 2022, six weeks into her probationary period, Autokiniton terminated Plaintiff; according to them, this was for insubordination based on her refusal to do her job and leaving CR in violation of the Work Rules.  Autokiniton's Work Rules prohibit "leaving your designated work area before your scheduled quitting time" and "refusal to follow directions from your Supervisor, insubordination."  ECF No. 29-9, PageID.401-02.  Plaintiff claims these work rules do not apply to her.  ECF No. 38, PageID.1496.[9]  Across a variety of

---

[8] Huston nonetheless takes the position in her brief that she understood the CR area to be "not for women."  ECF No. 38, PageID.1491-92.

[9] Her basis for that argument is that if the "progressive discipline" policy did not apply to her, then neither do the "work rules."  ECF No. 38, PageID.1496.

allegations, Plaintiff claims this was not the real reason she was terminated.

Huston's theory of liability regarding retaliation is somewhat complicated.  She alleges that she is the sister of the plaintiff in a companion case, *Williams v. Autokiniton* (Case No. 23-12404).  On October 28, 2022, Tiara Williams, who also worked at Autokiniton, complained to HR that she was being sexually harassed by James Pace, former Plymouth Operations Manager.  HR took Plaintiff's statement and later interviewed Pace.  Sometime after Pace's interview, the Company retained outside counsel to complete an investigation.  In December 2022, outside counsel interviewed Williams and approximately seventeen other employees, but determined the claims to be unsubstantiated and the company took no action in Williams' favor.

The investigation into Williams' allegations also took a turn in December 2022 during the Company's interviews with two hourly employees: Precious Knox and Tashodd Timms.  Those individuals alleged that Williams offered to pay them to lie by claiming they witnessed Pace sexually harassing Williams.  Autokiniton says that based on Knox's and Timms' statements and affidavits, which they

deemed credible, the Company concluded that Williams tried to bribe Knox and Timms to lie during the Company's investigation, in violation of the Code of Conduct. Autokiniton thus (according to them) terminated Williams' employment on January 5, 2023. *See* Case No. 23-cv-12404, ECF No. 39, PageID.341. Williams brought claims for sexual harassment, retaliation, and race discrimination in the related case before the undersigned.[10]

Huston claims that she was fired in retaliation for her sister's sexual harassment complaint and her association with her sister. Huston was fired on November 1, 2022 (ECF No. 29-17, PageID.437),[11] and the first instance of Williams making sexual harassment allegations was on October 28, 2022. ECF No. 29, PageID.240.[12] Huston claims (briefly) that James Pace, the plant manager who

---

[10] This court dismissed all of those claims and entered judgment accordingly. Case No. 23-12404, ECF Nos. 67, 69. Plaintiff has filed a motion to alter/amend that judgment which is currently pending. *See* ECF No. 70.

[11] The letter is dated November 2, 2022, but is effective November 1, 2022.

[12] Autokiniton also terminated Diane Maccani, the HR rep who at first handled Williams' complaint, on November 3, 2022, which they say was for work performance issues. Maccani herself did not refute that point. ECF No. 29, PageID.240.

allegedly sexually harassed Williams, made her work harder in the plant.  ECF No. 38, PageID.1500 (citing ECF No. 38-1, PageID.1574).[13] She also says that Pace was "suspicious[ly]" included on the message from Mosher (the CR supervisor) informing plant personnel of Huston walking off the job on October 28, 2022.  ECF No. 38, PageID.1513; *id.* at PageID.1500.  Huston says that on October 28, 2022, HR was made aware that she and Williams were sisters.  ECF No. 38-1, PageID.1540. She also alleges that, although she was probationary and "subject to discharge with or without cause" (ECF No. 29-7, PageID.329), she was entitled to the benefits of the progressive discipline policy.  ECF No. 38, PageID.1496.  Huston additionally alleges that Autokiniton failed to accommodate her disability when it assigned her to the CR area, and that it discriminated against her on the basis of race and disability.

## III.   STANDARD OF REVIEW

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any

---

[13] While the court includes this specific fact because Huston references it in her statement of facts, she never addresses it again nor analyzes it as part of her retaliation claim, and the court does not further consider it in relation to any of her claims.

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts

showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

## IV.   ANALYSIS

### A.   Retaliation (Title VII and ELCRA) (Counts I and II)

To establish a prima facie case of retaliation, a plaintiff must show: (1) that she engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an adverse employment action; and (4) that there was a causal connection between

the protected activity and the adverse employment action. *Fenton v. HiSan, Inc.*, 174 F.3d 827 (6th Cir. 1999). If a plaintiff proves a prima facie case, the defendant must put forth a legitimate, non-retaliatory reason for the action. If successful, the plaintiff must then prove that the defendant's reason was a pretext for retaliation. *Polk v. Yellow Freight System, Inc.*, 876 F.2d 527 (6th Cir. 1989). A plaintiff may show pretext in a number of ways, including by demonstrating that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action. *Smith v. Chrysler Corp.*, 155 F.3d 799, 805-06 (6th Cir. 1998).

Here, it should be noted at the outset that Plaintiff makes no allegation (or argument) that she experienced retaliation for ADA-protected activity. She alleges *only* that she was retaliated against for her association with her sister Tiara Williams or for her own protected activity in reporting the alleged sexual harassment directed at Williams. *See* ECF No. 1, PageID.5-6; ECF No. 38, PageID.1506-08; ECF No. 38-2, PageID.1753 (Maccani testifying that Huston told her that Williams was experiencing sexual harassment).

13

For the sake of efficiency, the court jumps to the most important issue: the causal connection between the termination and retaliatory motive, a legitimate, non-retaliatory reason for terminating Plaintiff, and evidence of pretext. Defendant has asserted a legitimate, non-retaliatory reason for moving Huston to CR and terminating her: they moved Plaintiff to CR to address staffing issues in that area and because Plaintiff had the lowest seniority of those available to help. Defendant then terminated Plaintiff for insubordination for refusing to work the CR area, in violation of the Work Rules when she was only six weeks into her probationary, at-will employment period. The burden is thus with Plaintiff to show that, despite the evidence of a nondiscriminatory reason for her termination, a reasonable jury could find that this purported reason was pretextual when the actual reason was her association with Tiara Williams and Williams' sexual harassment complaint.

Plaintiff comes forward with the following arguments that she says prove pretext: the "close temporal proximity between HR's awareness of the protected activity/relationship of Plaintiff to Tiara Williams;" the alleged lack of basis for Williams' termination; the lack

14

of progressive discipline for Huston (i.e. that she was fired rather than given a disciplinary measure short of dismissal); that she was allegedly told at the time that she was being terminated "so she would not further injure herself" but Defendant now claims she was terminated for insubordination and abandoning her job, even though she returned to work at a different part of the plant; that there is "no contemporaneous documentary evidence of any kind as to the reason for Plaintiff's termination;" that the HR representative who fired Plaintiff was herself fired and could not recall Plaintiff's termination; and that "Defendant fired everyone it believed to be associated with Tiara Williams." ECF No. 38, PageID.1507-08. Of these statements, Plaintiff backs up none with citations to record evidence. *See id.* It is not the court's job to try and piece together a plaintiff's case for them. *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008); *see Emerson v. Novartis Pharms. Corp.*, 446 F. App'x. 733, 736 (6th Cir. 2011) (quoting *United States v. Dunkel*, 927 F.2d 955, 956) (7th Cir. 1991) ("'Judges are not like pigs, hunting for truffles' that might be buried in the record."). Nonetheless, all of her arguments are without merit.

15

*Temporal proximity.* As an initial matter, it is well-established in this circuit that "temporal proximity cannot be the sole basis for finding pretext." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 471-72 (6th Cir. 2012) (in the retaliation context, the Sixth Circuit has "repeatedly cautioned against inferring causation based on temporal proximity alone"). Thus, absent some independent evidence of a connection between the two, suspicious timing alone is not enough.

*Williams' termination.* On that note, Williams' termination is too far removed from Huston's to treat them as part-and-parcel; Williams (the alleged reason for Huston's termination) was terminated in January 2023, after an investigation into her claims in December 2022. Huston was terminated at the beginning of November 2022, before any investigation formally began into Williams' claims beyond HR's initial interview with Williams. Even assuming for the moment that the given reasons for Williams' termination (i.e. that she tried to bribe coworkers to lie and provide statements in support of her claim) were pretextual,

16

that does not show that *Huston*'s termination was pretextual merely by association.[14]

*Progressive discipline.*  The lack of progressive discipline for Huston is fully explained by her probationary status, and there is no genuine dispute of fact on this point.  ECF No. 29-7, PageID.329 ("New employees shall . . . be subject to discharge with or without cause (and without recourse to the Grievance Procedure/Arbitration processes set forth hereinafter) . . .").  Plaintiff's argument that the Work Rules[15] cannot apply to her unless the progressive discipline policy also applies to her (that the employer "cannot pick and choose" which policies apply to probationary employees) is not logically sound.  *See* ECF No. 38, PageID.1496.  Huston cites no authority for the proposition that an employer cannot make some rules generally applicable to all employees, probationary or not, and make some rules apply only to non-

---

[14] Although not actually relevant to this point, this court also has found that there is no genuine dispute of fact that Autokiniton had an honest belief that Williams had attempted to bribe coworkers when it terminated Williams.  *See* Case No. 23-cv-12404, ECF No. 67.

[15] The Work Rules prohibit "leaving your designated work area before your scheduled quitting time" and "refusal to follow directions from your Supervisor."  ECF No. 29-9, PageID.401-02.  Plaintiff argued that if the "progressive discipline" policy did not apply to her, then neither do the "work rules."  ECF No. 38, PageID.1496.

probationary employees.  For that matter, she cites no evidence showing that her employer in fact applied the progressive discipline policy to other probationary employees but not her.[16]

*Terminated in order "not to injure" herself.*  Plaintiff's next argument is somewhat confusing.  She says it is evidence of pretext that she "was told she was being terminated so she would not further injure herself, but Defendant claims she was terminated for insubordination and abandoning her job, even though she returned to work a full shift on the line (which she could do without issue), and she was physically unable to lift what she was being asked to lift."  ECF No. 38, PageID.1507-08.  But the inferential steps here do not work.  She is (as far as the court can tell) arguing that Defendant now rests their argument on her alleged insubordination, when at the time she was fired, someone allegedly told her she was being terminated so that she

---

[16] Ryan Hernandez, Director of HR Operations and Labor Relations, testified that probationary employees "are subject to discharge without a reason during the probationary period" and thus the company does not "necessarily follow progressive discipline policy with probationary associates."  ECF No. 38-7, PageID.1986. Plaintiff says this shows she *was* entitled to the benefits of the probationary policy, but his testimony says the opposite; the use of the progressive discipline policy was discretionary as to probationary employees.  Plaintiff points to no evidence that the progressive discipline policy was in fact used for similarly situated probationary employees.

would not further injure herself.[17] But even accepted as true, that would purport to show that their actual reason was *disability*-related, not retaliation for her sister's sexual harassment complaint[18] – and if her point is that the "not further injure" herself line was actually itself a cover for *sexual harassment*-related retaliation, then the point is not clearly made and the inference is not explained or backed up with any evidence.

*Contemporaneous evidence of intent.* As far as there being "no contemporaneous documentary evidence" of her termination, it is not clear what Huston is referring to; she may be simply selectively viewing the evidence. Her termination letter cites the work rules and regulations, albeit not a specific rule. ECF No. 29-17, PageID.437. The

---

[17] Note that, while the court accepts that Plaintiff testified that this was said to her and Plaintiff's credibility would be a matter for a jury (ECF No. 38-1, PageID.1538), at least some evidence suggests that Plaintiff *herself* was the originator of that phrase, not an agent of Defendant. *See* ECF No. 38-1, PageID.1698. Because Plaintiff only raises this in the context of her retaliation claims, the court does not analyze it in the context of disability discrimination.

[18] This mixing-and-matching of purported motivations (i.e. treating disability, racial, and associational sexual harassment retaliation as interchangeable motivations) is an issue that comes up several times in Plaintiff's briefing, as will become clear. Her federal retaliation claim, however, is brought under Title VII, not the ADA (ECF No. 1, PageID.5), and her state law retaliation claim is likewise based entirely on "her association with her sister, Tiara Williams, who had been subjected to sexual and racial harassment." *Id.* at PageID.7. No allegation under either count mentions retaliation on the basis of Huston's race or disability.

letter is contemporaneous documentary evidence of the reason for her termination.

*Termination of the HR rep who initiated the Williams investigation.* Huston alleges that it is evidence of pretext that Defendant also fired Diane Maccani, who was terminated on November 3, 2022 (the day after Huston was terminated), and who initially interviewed Tiara Williams. But Maccani testified that she was fired for unrelated problems. ECF No. 38-2, PageID.1751. Nothing about Maccani's termination suggests that it was done pretextually or in connection with Williams' termination, and Huston's speculation that Maccani's termination was connected to Williams' (and is therefore, in her view, also connected to her own) is insufficient to create a genuine dispute of fact on that point. Huston's argument that "[e]ven Maccani herself could not rule out that this [Williams' termination] was the motivation for her [Maccani's] termination" openly misrepresents the testimony in Maccani's deposition. *See* ECF No. 38-2, PageID.1752 (Maccani's deposition) (Plaintiff's counsel: "Did you think it [Maccani being let go] had anything to do with Ms. Williams' investigation?" Maccani: "No." . . . Plaintiff's Counsel: "so you're saying that you didn't

20

think that there was a connection between those two things." Maccani: "No I did not.").[19]

*Termination of other individuals associated with Tiara Williams.* Huston's allegation that "Defendant fired everyone it believed to be associated with Tiara Williams" is not backed up by anything but Plaintiff's own speculation. In total, Plaintiff has alleged four people were terminated associated with Tiara Williams: Huston, Maccani, a third individual allegedly friends with Williams, and Williams herself. The court has addressed Maccani and Williams above. No evidence by anyone with personal knowledge was brought forward as to a third person who was allegedly fired. Huston speculates that the reason for each person's termination was that Pace was "out to get" everyone associated with Williams, but did not testify as to personal, non-hearsay knowledge of why that person was fired, and so her testimony is not sufficient to create a genuine dispute of fact. *See* ECF No. 38-1, PageID.1554-55. More importantly, this other person was fired "two

---

[19] Plaintiff's statement that Maccani was "shaking and sweating when she was terminating Plaintiff, which Plaintiff took to mean she knew what she was doing was wrong" is speculation as to her body language, and the court does not consider it evidence of pretext. *See* ECF No. 38, PageID.1498.

21

days before" Huston started work at Autokiniton. *Id.* Accepting both Williams' and Huston's narratives and testimony as essentially true, Williams never made a formal complaint regarding sexual harassment until October 2022, and Huston's narrative only attributes Pace's attempts to get rid of persons associated with Williams once Williams made her complaint. *See* ECF No. 38, PageID.1507 ("The exact same day that Defendant's agents learned of the relationship when Plaintiff made her complaint, Defendant moved Plaintiff to a job she was physically not able to do . . ."). Huston's testimony was that the knowledge that she was Williams' sister spread "real quick" the same day that Williams made her report and that Huston experienced retaliation that same day for that reason. *See* ECF No. 38-1, PageID.1534. But Huston started work in September 2022, and this other individual was terminated before Huston started work – over a month before Williams made her sexual harassment complaint. While credibility is generally a matter for a jury, no reasonable jury could find Huston's testimony credible regarding the reasons for this other individual's termination.

22

Huston's suspicions that Pace was involved in her own termination are also speculation.  She says, "A member of operations, not just HR, had to approve the termination, and this could include Pace, who was the only operations manager on-site."  ECF No. 38, PageID.1502.  But "could" is not "did," and this speculation with no supporting evidence is insufficient to defeat summary judgment.  While Huston says that "Pace [] injected himself into" her termination process "by being copied on the email from Tom Mosher [Huston's supervisor], when that was not typical" (ECF No. 38, PageID.1500), that is not how Mosher characterized the email.  Mosher simply summarized the events about how Huston refused to work the CR area and walked away, and relayed his summary to a number of people, and *Mosher* copied on his email the union rep, HR, and Pace (because, according to Mosher, Pace was in charge of the shift).  ECF No. 38-6, PageID.1951-52.  There is no evidence at all that Pace was actually involved in Huston's termination other than being copied on this set of emails and being told by Mosher what happened.  The upshot is that any connective tissue between Pace's alleged vendetta against people associated with Williams' sexual

23

harassment claims, and Huston's own termination, is speculation on Huston's part without support from record evidence.

At core, Plaintiff's theory of retaliation connecting James Pace (Williams' alleged harasser) to her (Huston) is that Williams reported Pace's sexual harassment, Huston told the HR manager that her sister had made a claim of sexual harassment against Pace,[20] Pace found out about Williams' report (all on the same day, October 28), that it was generally known that Huston was Williams' sister,[21] Pace immediately told his friend Will Kennedy about Williams' report, who then assigned Huston to the CR area in retaliation for Williams' report, where Huston walked off the job due to her alleged inability to lift the rails, and then management made the decision to fire Huston as pretext for her association with Williams.

But there is no actual evidence that 1) Pace knew about *Huston*'s report of Williams' harassment (rather than Williams' report to HR on

---

[20] ECF No. 38, PageID.1507.

[21] "Title VII prohibits retaliation against someone so closely related or associated with the person exercising his statutory rights that it would discourage or prevent that person from pursuing those rights." *Rodriguez-Monguio v. Ohio State Univ.*, 499 F. App'x 455, 464 (6th Cir. 2012).

24

the same day), 2) that Pace told Kennedy about Huston's protected conduct or Williams' connection to Huston, 3) that Kennedy made Huston go to the CR area because of her connection to Williams rather than because that area was short-staffed,[22] 4) that Kennedy also knew about Huston's disability and therefore was making Huston work the CR area in order to somehow force her termination to occur by correctly predicting that Huston would refuse to lift the 15-pound rails, or 5) that those who made the decision to fire Huston were influenced by Pace or by improper motive. Plaintiff's theory – which is never clearly laid out – is too attenuated a chain of inferences, with too many missing evidentiary links.

Admittedly, it is not clear who exactly, made the determination to terminate Huston. Maccani recalled "leaders" being part of the decision alongside herself, but not who.[23] But this lack of clarity is not sufficient

---

[22] Huston testified that Kennedy knew she was Williams' sister, ECF No. 38-1, PageID.1534, but that does not draw any of the other inferences.

[23] In an answer to an interrogatory, Defendant said it was Ryan Hernandez and Stephanie Cauley (individuals who work or worked in HR) who made the decision, along with Maccani. ECF No. 29-18, PageID.444. However, that interrogatory was only signed by defense counsel, and so was not made with personal knowledge and is inadmissible at summary judgment. *See Duff v. Lobdell-Emery Manufacturing Co.*, 926 F. Supp. 799, 803 (N.D. Ind. 1996) (disregarding

to show that a reasonable jury could find, by a preponderance of the evidence, that those making the decision were influenced by retaliatory motive related to Williams' sexual harassment complaint.

Summary judgment is therefore granted as to Count I. Because retaliation claims under Title VII and the ELCRA are reviewed under the same standard, summary judgment must likewise be granted as to Count II as well. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (noting in case where plaintiff brought a retaliation claim under both Title VII and the ELCRA that "the ELCRA analysis is identical to the Title VII analysis"); *see also Bivens v. Zep, Inc.*, No. 23-cv-11398, 2024 U.S. Dist. LEXIS 180016, at *6 (E.D. Mich. Nov. 22, 2024).

### B. Disability Discrimination (Counts III and V)[24]

Plaintiff brings her disability discrimination claim on circumstantial evidence, and so the court employs the familiar *McDonnell Douglas* burden-shifting framework. To establish a prima

---

defendant's answers to plaintiff's interrogatories on summary judgment because "if a party relies upon an opposing party's answers to interrogatories, the answers are admissible as statements of a party opponent, but a party's own answers are not so admissible.") (citation omitted).

[24] There appears to be no Count IV. ECF No. 1, PageID.8-9.

26

facie case, an employee must demonstrate that (1) she has a disability, (2) she is otherwise qualified for the job with or without reasonable accommodation, (3) she suffered an adverse employment decision, (4) her employer knew or had reason to know of her disability, and (5) her position remained open, or she was replaced. *Hrdlicka v. GM LLC*, 63 F.4th 555, 566 (6th Cir. 2023). If the employee establishes a prima facie case, the burden shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action. The burden then shifts back to the employee to show that the purported nondiscriminatory reason was actually a pretext designed to mask discrimination. *Id.*

Plaintiff argues in her response that she 1) has a disability, 2) was otherwise qualified as a PO, 3) was transferred to the CR area (arguing that this was the relevant materially adverse action), and 4) her employer knew of the disability. Somewhat bafflingly, Plaintiff never addresses the fifth and final point (that the position remained open/that she was replaced by a nondisabled individual). Setting that fifth element to the side, Plaintiff's case still stumbles right out of the gate because, as Plaintiff emphasized in response to the court's questions at

27

oral argument, the only adverse action being advanced under Plaintiff's theory is the "transfer" to the CR area (i.e. being given an undesirable work assignment). An adverse employment action is "a materially adverse change in the terms and conditions of a plaintiff's employment." *Deleon v. Kalamazoo Cty. Rd. Comm'n*, 739 F.3d 914, 918 (6th Cir. 2014) (citation omitted). "An employee's transfer may constitute a materially adverse employment action, even in the absence of a demotion or pay decrease, so long as the particular circumstances present give rise to some level of objective intolerability." *Id.* at 919. A mere inconvenience or an alteration of job responsibilities or a "bruised ego" is not sufficient to constitute an adverse employment action. *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 797 (6th Cir. 2004) (en banc) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). A plaintiff's material job responsibilities need to have been negatively impacted significantly. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004). An employee's subjective opinion of the transfer, positive or negative, is not dispositive of employment actions classification as "adverse." *Deleon*, 739 F.3d at 921 (internal citations omitted). Huston's "transfer" to a subjectively undesirable

28

work area is insufficient to show material adversity.  *See Hunter v. Sec'y of United States Army*, 565 F.3d 986, 996-97 (6th Cir. 2009) ("transferring Hunter to another unit" was insufficient to establish that it was materially adverse "because Hunter has not alleged that being transferred to a new work unit resulted in significantly different responsibilities, a change in benefits, or any other negative effect").

But in any event, assume that Plaintiff successfully made out a prima facie case.  *See* ECF No. 38, PageID.1509-10.  Defendant also argued in their motion that even if Huston could establish a prima facie case, that they had a legitimate and nondiscriminatory reason for taking the actions they did: Defendant moved Plaintiff to CR to address staffing issues, and Defendant terminated her for insubordination in refusing to work that area.  They point, for that proposition, to a number of different points of testimony and evidence.  *See* ECF No. 29, PageID.252-53 (argument in brief); ECF No. 29-14, PageID.426 (supervisor deposition testimony regarding insubordination); ECF No. 29-15, PageID.433 (supervisor email regarding same); ECF No. 29-17, PageID.437 (termination letter); ECF No. 29-8, PageID.393-94, 397 (HR representative deposition); ECF No. 29-11, PageID.412 (second HR

29

representative deposition).  So the burden shifts to Plaintiff to explain "that the purported nondiscriminatory reason was actually a pretext designed to mask discrimination" on the basis of disability.  *Hrdlicka*, 63 F.4th at 566.

Plaintiff barely makes any response to this point at all.  The majority of any discussion of pretext in her response can be found in the context of race discrimination, and retaliation under Title VII, but not disability discrimination.  *See* ECF No. 38, PageID.1512; ECF No. 38, PageID.1508.  Although the point is not clearly made, Huston appears to argue only that "on the day Defendant learned that Tiara Williams was her sister, Plaintiff was transferred to a different position where she was asked to lift heavy objects."  ECF No. 38, PageID.1509.  But this argument, construed as an argument addressing pretext, does not show a pretext for *disability* discrimination; it is an argument that Defendant retaliated and sent her to work the CR area because of protected activity related to sexual harassment, which is a theory unsupported by record evidence, as explained above.  As far as the argument instead argues that she should not have been required to lift heavy objects when her employer knew or should of known of her

30

disability, it is more properly a failure to accommodate claim, which is addressed below in her counts that directly address that issue. *See* ECF No. 38, PageID.1509 (though ostensibly under disability discrimination, arguing that Defendant "could have reasonably accommodated Plaintiff by not reassigning her to a position that required heavy lifting after she had already reported to work in another area"). Or if this argument genuinely attempts to dispute pretext on a disability discrimination claim, it does so perfunctorily and without development. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting citation omitted). The court finds that Defendant has met their burden to show that there is no genuine dispute of material fact as to lack of pretext, and Defendant is therefore entitled to summary judgment as to Count III. Generally, ADA and PWDCRA claims are analyzed identically. *Hrdicka v. General Motors, LLC,* 63 F.4th 555, 566 (6th Cir. 2023). Therefore, summary judgment is also granted as to Count V.

31

### C.    Failure to Accommodate (Counts VI and VII)

The ADA prohibits an employer from discriminating against a qualified individual on the basis of disability.  42 U.S.C. § 12112(a). Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability unless the accommodation would impose an undue hardship."  *Id.* at § 12112(b)(5)(A); *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007).

To prevail on a failure-to-accommodate claim, the plaintiff must establish (1) that she is disabled, and (2) that she is "'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation."  *Fisher v. Nissan North America, Inc.*, 951 F.3d 409, 417 (6th Cir. 2020) (citations omitted).  The defendant then bears the burden of proving that a challenged job requirement is essential, or that a proposed accommodation will impose an undue hardship.  *Id.*

As a predicate matter, however, an employee must communicate the fact of their disability and a request for accommodation. *See Deister v. AAA Auto Club of Michigan*, 91 F. Supp. 3d 905, 925 (E.D. Mich. 2015) ("[T]here is no question that the EEOC has placed the initial burden of requesting an accommodation on the employee. The employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation."); 42 U.S.C. § 12112(b)(5)(A) (the ADA makes employers responsible only for "*known physical or mental limitations*") (emphasis added). That requirement is excused only "when a request would be futile" or when the need for accommodation is obvious or already known to the employer. *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004).

### i.    Disability

Although Defendant disputes whether Huston was disabled under the meaning of the ADA during the relevant period, at this stage the court finds that a reasonable jury could find that she was disabled during that time, or else that factual development is necessary to determine whether she meets the relevant legal standard. *Compare* ECF No. 29, PageID.249 (arguing that Huston makes "bare assertions"

that she was disabled within the meaning of the ADA), *with* ECF No. 38, PageID.1492 ("Plaintiff testified to her inability to lift her arms over her head, turn her head quickly, or run when she started working for Defendant. She also testified that she needed her daughter to complete most household chores and even help wash her back when bathing.") (citations omitted); *see* ECF No. 29-6, PageID.305 (relevant portions of Huston deposition). Although Huston's testimony is the only evidence on the point, she testified that she was in a car accident which caused her shoulder and neck pain.

The court does not find Defendant's citation to the nonbinding and unpublished *Neely v. Benchmark Family Servs.*, 640 F. App'x 429 (6th Cir. 2016), to be dispositive here. In that case, the plaintiff's self-described diagnosis of sleep apnea was affirmatively rebutted by his physicians' opinions, who apparently declined to make that diagnosis and instead focused on the plaintiff's "poor sleep hygiene." *Id.* at 433. So because the medical evidence "undermine[d]" the plaintiff's assertion that he had sleep apnea, he could not establish a "physical or mental impairment" within the meaning of the ADA. *See id.* Here, however, there is no evidence that similarly "undermines" Huston's testimony

34

that she was in a car accident that caused her pain. At least some of the medical evidence she submitted affirmatively backs up her testimony, albeit perhaps not on the same timeline she alleges. *See* ECF No. 42-1, PageID.2027; ECF No. 38-1, PageID.1688 (same document). While the inconsistencies in that documentation and the timelines they indicate on their face may very well undermine her claims, the court will explain in more detail below why her testimony suffices to create a material dispute of fact as to whether she remained disabled during the relevant period, even if her medical documentation does not purport to show that. *And see Cook v. Warren Screw Prods.*, No. 24-1192, 2025 LX 57461, at *9 (6th Cir. Mar. 27, 2025) (noting that federal regulations now state that even a "temporary impairment can constitute a disability"); 29 C.F.R. § 1630.2(j)(1)(ix) ("The effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section.").

Huston also has brought forward sufficient evidence on which a jury could find that her disability caused substantial impairment of major life activities. Besides an alleged inability to lift heavy objects, Plaintiff focuses on the evidence that her physical impairment

substantially limited bathing and housework. *See* ECF No. 38, PageID.1509. Her testimony that she could not lift heavy objects, complete housework on her own, or bathe herself is sufficient to establish a prima facie case that these activities were "substantially" impaired within the meaning of the ADA. *See Harrison v. Soave Enters. L.L.C.*, 826 F. App'x 517, 525 (6th Cir. 2020) (plaintiff showed "substantial" limitation at the prima facie stage because "a reasonable juror could determine that the majority of the general population" could do the task and "does not share [plaintiff's] physical limitation"); *Salim v. MGM Grand Detroit, L.L.C.*, 106 F. App'x 454, 459 (6th Cir. 2004) ("a major life activity means 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'") (citing 29 C.F.R. § 1630.2(i)); 29 C.F.R. § 1630.2(i)(1)(i) (lifting is a major life activity).[25] Again, the

---

[25] The court notes that even Huston's doctor's note indicating some restrictions did not specifically explain lifting restrictions or specific poundage. *See* ECF No. 42-1, PageID.2027. However, the note also indicates restrictions in "bending, lifting, twisting and prolonged [sic] as required by vacuuming, making beds, washing floors, sinks and bath tubs," which could lead to the reasonable inference that she had difficulty lifting heavy objects. *See id.*

evidence here is mixed, but viewed in the light most favorable to Huston, the issue cannot be foreclosed here.[26]

### ii.    Otherwise Qualified

Defendant also argues that Huston was not "otherwise qualified" for the position.  In their view, an individual must be able to perform the position's essential functions to be "qualified" for the position. *E.E.O.C. v Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015). Generally, if an employee cannot perform her duties because of her disability, she is not a "qualified individual" and employees need not offer an accommodation.  *See Krevinghaus v. Hills & Dales Gen. Hosp., Inc.*, 190 F. Supp. 3d 694, 700, 703-04 (E.D. Mich. 2016) (dismissing disability claims where plaintiff could not perform the job's essential functions).  "Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential." *Ford*, 782 F.3d at 761-62; *Peden v. City of Detroit*, 680 N.W.2d 857, 871 (Mich. 2004) (same).

---

[26] Although not analyzed in depth here, because Huston has otherwise met her prima facie burden, it is also possible that Huston would satisfy the alternative that Autokiniton "regarded" her as having a substantial impairment, given her allegations of her employer's knowledge of her limitations.  *See* ECF No. 38, PageID.1509 (arguing the point); *Harrison v. Soave Enters. L.L.C.*, 826 F. App'x 517, 525 (6th Cir. 2020); 42 U.S.C. § 12102(1)(C).

Defendant argues that Huston refused to perform an essential function of her job, and thus is not a qualified individual.  According to Defendant, being able to perform the tasks associated with any given production area, including lifting, is an essential function of the PO position.  *See* ECF No. 29, PageID.249-50.  Their arguments fail for two reasons.

First, their position that a job description is sufficient to end the inquiry is incorrect.  *See Ford*, 782 F.3d at 765 ("Our ruling does not, . . . require blind deference to the employer's stated judgment."); *Rorrer v. City of Stow*, 743 F.3d 1025, 1039-40 (6th Cir. 2014) ("Written job descriptions are [ ] not dispositive.").  While an employer is entitled to define the job in question, merely stating that something is a genuine prerequisite is not sufficient to render it truly essential.  *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("[A]n employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description."); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 929 (7th Cir. 2001) ("There is, on this record, a jury question as to whether an employment history demonstrating responsibility,

38

safety and dependability was a genuine requirement for the position . . . ."); *Mashni v. Bd. of Educ.*, No. 15 C 10951, 2017 WL 3838039, at *16, 2017 U.S. Dist. LEXIS 141706, at *40 (N.D. Ill. Sep. 1, 2017) ("the so-called 'legitimate prerequisites' that the Board claims Mashni failed to meet are also unsupported by the record").  Suppose, for instance, that Autokiniton regularly allows certain POs to refrain from working certain areas.  But Autokiniton then denies the same accommodation to a PO with a known disability that prevents her from working a given area.  A genuine fact issue might exist as to whether being capable of working any area is actually essential because it would be contradicted by materially similar job practice.  *See Ford*, 782 F.3d at 765 (posing a similar hypothetical, but with a fire department).[27]  Here, the defendant employer has not come forward with sufficient evidence that this purported job requirement is in fact essential – they largely present

---

[27] Huston emphasizes that she testified that she was able to operate in her position from the time she started in September until October 28, 2022 without lifting heavy objects, which, perhaps, a jury could find suggestive that lifting heavy objects was not an essential requirement of the job.  *See* ECF No. 38-1, PageID.1572.  However, that alone is likely not particularly probative.  *See, e.g.*, *Lowry v. Eastman Kodak Co.*, 14 F. App'x 27, 31 (2d Cir. 2001) (holding that rotating shifts were essential to a boiler operator position); *Kallail v. Alliant Energy Corporate Services, Inc.*, 691 F.3d 925 (8th Cir. 2012) (rotating shifts essential when facilitating training, territory familiarity, and equitable performance of less attractive shifts).

merely their own statement in their summary judgment motion that it is so. *See* ECF No. 29, PageID.250; ECF No. 29, PageID.255; *but see* ECF No. 29-11, PageID.412 (some testimony indicating that all PO's are expected to perform all jobs, though not explaining why). Those statements and limited testimony do not meet Defendant's burden at the summary judgment stage to put the matter beyond dispute.

Second, even crediting that a job description is a relevant consideration as to whether a given job requirement is truly "essential," Defendant did not produce any job description in their motion or exhibits. A job description seems to have been referenced in some of the depositions, but appears nowhere – that the court can tell – in the exhibits to this motion. So Defendant has not met their burden to produce evidence showing that the matter ought to be taken from the jury's hands.

Plaintiff, on the other hand, has argued that Autokiniton "could have reasonably accommodated Plaintiff by not reassigning her to a position that required heavy lifting after she had already reported to work in another area." ECF No. 38, PageID.1509. Defendant makes no real effort to analyze whether it would be a reasonable accommodation

to simply allow a PO to not rotate onto certain areas such as the CR area, and so fails to carry their burden to show that no reasonable jury could find that Huston was "otherwise qualified" for the position with or without a reasonable accommodation.

### iii.    Request for accommodation

Huston's claims are trickier at the request for accommodation element.  Part of that is because her theory of the case is hard to follow.  Huston argues that she made a few different relevant requests.  She says she "testified that she informed her supervisors that she could not lift rails due to her condition, and had been injured."  ECF No. 38, PageID.1510 (citing Huston Dep. ECF No. 38-1, PageID.1535-36, 68:10-72:16); *id.* at PageID.1511 (citing ECF No. 38-1, PageID.1537 (Huston Dep. 76:14-19, 109:9-20) (referring to a meeting with Stephanie Cauley in HR)).  Huston also claims that Autokiniton was already on notice of her disability: "Defendant knew that she had already provided a note and had been in injured in an accident, [and] that she provided a 'restriction-free' note as requested just so she could start working."

ECF No. 38, PageID.1509.[28]  Huston says that her text messages from October 28, 2022 show her communicating with colleagues about her reassignment and her need to speak to supervisors about her inability to lift heavy objects.  ECF No. 38, PageID.1510 (citing ECF No. 38-1, PageID.1664-65).  The court takes these points one at a time.

### a.    *Whether Huston informed supervisors that she could not lift rails due to her condition*

Huston's argument is essentially that she properly made a request for accommodation after she refused to work the CR area and in follow-up conversations with supervisors that same day.  When requesting an accommodation, an employee is not required to use magic words such as "accommodation" and "disability," but they still must use sufficient language such that "a factfinder could infer that [the interaction] constituted a request for an accommodation." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020).  "Once an employee requests an accommodation, the employer has a duty to engage in an interactive process." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 857 (6th Cir.

---

[28] Plaintiff puts all of this under her "disability discrimination" claim, but incorporates it by reference in her failure to accommodate argument.  *See* ECF No. 38, PageID.1511.

2018).  From that point, "both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871; *Fisher*, 951 F.3d at 421.  If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility." *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).

Huston's argument on this issue cites to her testimony that, after leaving the CR area, Tom Mosher came over to talk to her when she was on another line and "said if he would have knew [about Huston's alleged disability], he would have never told [her] to . . . come over there."  ECF No. 38-1, PageID.1535.  Plaintiff also told Mosher at the time he asked her to lift the rails that she did not think she could lift them.  ECF No. 38-1, PageID.1558.  While the court doubts that merely saying "I don't think I can lift them" and then leaving the CR area would suffice to put her supervisor on notice that she was requesting an accommodation on grounds of disability,[29] and her testimony does not

---

[29] *See Harrison v. Soave Enters. L.L.C.*, 826 F. App'x 517, 523 (6th Cir. 2020) ("[A] plaintiff need not even tell her employer about her specific diagnosis.  Rather, it is enough that a plaintiff simply tells her employer that she has certain limitations in relation to her work because she suffer[s] from a disability as defined by the ADA.") (cleaned up, quoting citation omitted).

clearly establish how Mosher learned about her alleged disability in the intervening period, Huston's testimony that Mosher came up to her later would be sufficient to establish that her supervisor was timely made aware of her disability before terminating her, knew that her disability was why she had refused to lift rails, and should have reasonably construed that as a request for accommodation.

Huston also argues that she notified Stephanie Cauley in HR about her condition in a meeting later on October 28th. *See* ECF No. 38-1, PageID.1545. Huston testified that she said "I told her that I couldn't lift the parts and I said, 'If I hurt myself and can't perform the job, I'm not going to be able to work[.]'" ECF No. 38-1, PageID.1537. Again, combining this testimony with her statements to Mosher, and Mosher's later statements to her, there is sufficient information that a reasonable jury could conclude that Huston put Autokiniton on notice of her need for accommodation. From that request, a reasonable jury could also conclude that this shifted the burden to Autokiniton to continue the interactive process, and Huston's firing was in violation of Autokiniton's duty under the ADA to first explore reasonable accommodations.

44

b.     *Huston's text messages*

Huston's text messages are between herself and Kim Gault in HR, regarding her hiring process and sending Gault her "no restrictions" paperwork.  *See* ECF No. 38-1, PageID.1664-65.  These, in the court's view, are merely evidence of Huston's theory that Autokiniton knew she had a disability when hiring her, but required her to provide "no restrictions" paperwork before allowing her to start work rather than engaging in an interactive process to discuss reasonable accommodations.  The court addresses that theory more broadly in the next section.

The court notes, however, that Huston's specific argument was that "Plaintiff's text messages from October 28, 2022 show her communicating with colleagues about the reassignment and her need to speak to supervisors about her inability to lift."  ECF No. 38, PageID.1510.  For that proposition, she cites her prior response at ECF No. 32-1, PageID.680.  *See id.*  Those same text messages are found in the exhibits to her updated response at ECF No. 38-1, PageID.1664.  But none of those text messages are dated October 28, 2022; they jump in time from September 19, 2022 to November 15, 2022.  No text

45

messages appear on the relevant date and so no text messages say what she claims. While the court accepts these texts as evidence of Huston's theory that Autokiniton knew of her disability, they do not provide any evidence for the proposition Plaintiff claimed.

    c.  *Autokiniton's alleged prior knowledge of Huston's ongoing disability*

  Plaintiff's second argument is that Autokiniton was aware of her need for restrictions and knew she was disabled, but required that she provide a note showing she had no lifting restrictions in order to bypass the requirements of the ADA. Plaintiff says that she "initially brought a note with restrictions but was told by Kimberly Gault that she would not let Plaintiff work if she did not have a note with cleared restrictions, so she requested a doctor's note (against his advice) without restrictions so that she could earn money." ECF No. 38, PageID.1493 (citing Huston Dep. at 151:13-154:21).

  As a general point, there is no genuine dispute that the paperwork that Huston provided Autokiniton stated she had "no restrictions" at the time she was assigned to the CR area. *See* ECF No. 29-12, PageID.415. Although Plaintiff says "Defendant does not cite to case

law explicitly stating that plaintiffs are required to provide medical documentation when requesting an accommodation" (ECF No. 38, PageID.1511), Autokiniton undoubtedly "had the right to ask for documentation from a health care provider articulating the medical necessity of her accommodation." *Kellar v. Yunion, Inc.*, 157 F.4th 855, 876 (6th Cir. 2025) (citing *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) (explaining that an employee "must" provide proof that an accommodation is medically necessary "when asked by his employer"); *Kennedy v. Superior Printing Co.*, 215 F.3d 650, 656 (6th Cir. 2000) ("An employer need not take the employee's word for it that the employee has an illness that may require special accommodation. Instead, the employer has the ability to confirm or disprove the employee's statement."). As far as Defendant seems to argue that an employee must come forward with medical documentation on her own as part of the prima facie process of requesting an accommodation (ECF No. 29, PageID.254), that goes slightly too far; the case law indicates that the employer, as part of the interactive process, may request documentation – not that medical documentation must as a matter of law be submitted alongside the

47

request for accommodation.  *See King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 564 (6th Cir. 2022) ("Medical documentation is not required" in starting the interactive process of a request for accommodation); *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs*, 974 F.3d 652, 669 (6th Cir. 2020) ("Kirilenko-Ison concedes that she did not provide the School Board with any documentation about her disability diagnosis during the interactive process").[30]  Autokiniton could validly require Huston to provide paperwork verifying her condition,[31] and there is no genuine dispute that the paperwork she did

---

[30] The meaning of *Kirilenko-Ison* in regard to a plaintiff's request for accommodation case has been disputed amongst the Sixth Circuit in nonbinding decisions, but *King* is binding and controls.  *See Moore v. Next Generation Hosp. LLC*, No. 24-4050, 2025 U.S. App. LEXIS 28522, at *18 (6th Cir. Oct. 29, 2025) ("an employer is 'not obligated to provide accommodation until the plaintiff ha[s] provided a proper diagnosis of h[is] disability and requested specific accommodation'"); *Woodie v. Motorola Sols., Inc.*, No. 24-3267, 2025 LX 227190, at *21 (6th Cir. Mar. 10, 2025) (Mathis, J., dissenting) ("*Kirilenko-Ison* does not hold that a plaintiff can only request an accommodation if he follows his employer's internal policy for doing so.  Instead, it discusses the interactive process, which occurs *after* a plaintiff requests an accommodation.").

[31] Autokiniton's policies could be read to indicate that employees must provide a "Request for Accommodation" form in order to start the interactive process.  *See* ECF No. 29-4, PageID.282.  But Defendant did not advance that argument, so presumably Plaintiff could still start the interactive process by verbally expressing her concerns, which she alleges she did.

48

provide had "no restrictions" during the relevant period.  *See* ECF No.

38-1, PageID.1732.[32]

So Huston's argument (as the court understands it) is somewhat

complex: her employer could *not* have validly relied on the paperwork

they had because they knew or should have known that paperwork was

a false statement – because the employer itself requested that Huston

provide cleared-for-work documentation in order to allow her to work

there at all.  With sufficient evidence and accepted as credible, this

theory would establish that her disability and need for accommodation

was known to the employer, excusing the need to explicitly request

accommodations.  *See Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755

---

[32] It is also unclear whether Autokiniton actually asked for any updated paperwork after the incident, or whether Huston was given an opportunity to do so. *See* ECF No. 38-1, PageID.1698 (Autokiniton's response to the EEOC charge) ("The Company gave Huston the opportunity to obtain medical documentation and indicated that without documentation from the provider, Huston is expected to perform the job duties at any workstation . . . ").  As far as Huston's theory is that Autokiniton already knew of her disability and requested essentially fraudulent paperwork, this is not a critical point.  As far as this instead raises the question of whether Autokiniton provided her an opportunity to give them updated paperwork but she did not comply, the court does not think the matter beyond dispute.  Autokiniton first met with her on a Friday; they terminated her the following week after reviewing her file.  Autokiniton and Huston disagree whether she was given a chance to provide them medical documentation supporting her claim.  *See* ECF No. 29-11, PageID.412 (referencing the chain of events preceding Huston's termination, and alleging they invited Huston to provide them with updated paperwork); ECF No. 38-1, PageID.1573 (Huston testimony, directly responding to Autokiniton's report, testifying that they never gave such an opportunity).

(6th Cir. 2004).  That knowledge would allow a reasonable jury to conclude that the employer, on notice of her disability, failed to engage in any interactive process or explore reasonable accommodations.

### d. Deposition testimony dispute

In support of this theory, Huston alleges that she was told by Kimberly Gault (in HR) that Autokiniton would not let Plaintiff work if she did not have a note with cleared restrictions, so Huston requested a doctor's note that said "no restrictions" against her doctor's advice so that she could earn a living.  *See* ECF No. 38, PageID.1493 (citing Huston Dep. at 151:13-154:21).  This is an important point on her failure to accommodate claim, so the court reproduces the relevant portions of her deposition here.  That portion of her deposition reads:

> Q: You had restrictions when you first started?
> A: **I wasn't able to do certain things, yes.**
>
> Q: Did anybody tell you you had to have a note, it was required, in order to get any type of accommodation?
> A: **Kimberly [Gault] told me to get a doctor's note.**
>
> Q: Did she say you had to have one or you couldn't get one?
> A: **Yeah, I had to have one.**

50

> Q: And what would happen if you didn't have the note?
> A: **I wouldn't be able to get employment with them.**

ECF No. 38-1, PageID.1556.

Huston did indeed provide a doctor's note to Gault, but critically, the restrictions it listed were limited to a month-long period from 8/22/22 to 9/22/22 (and Huston was not hired until September 20, 2022). *See* ECF No. 42-1, PageID.2027. The restrictions in the 8/22/22 note were then superseded by a second note issued on 9/19/22 that listed no restrictions. ECF No. 29-12, PageID.415.

> Q: [regarding the 8/22 doctor's note with restrictions] did you give this to Tower?
> **A: Yes.**
>
> Q: And what happened after you gave it to them?
> **A: She told me to come in. I had gave it to her, she said that it was -- it would work.**
>
> Q: Okay. So then how did you end up -- why did you get the one from September [the 9/19/22 Note]? . . . .
> **A: Because I told the doctor that I had to go back to work, I couldn't do restrictions because I need to pay my bills.**
>
> Q: Okay. Did the doctor agree with you?
> **A: No, he didn't, but he had to do it because I wanted to -- I had to do it. You know, he told me he don't think it's a good idea.**

51

ECF No. 38-1, PageID.1556.

Then came a series of questions from Plaintiff's counsel regarding

that second "no restrictions" note, that Autokiniton objects to:

> Q: Okay. And you felt that you had to give this to
> Tower?
> DEFENSE COUNSEL: Objection, leading.
> **A: Yes.**
>
> Q: All right. That's what you said before?
> **A: Yes.**
>
> Q: And you said Kimberly said she would not let
> you work if you didn't have cleared restrictions; is
> that right?
> **A: Right.**
> DEFENSE COUNSEL: Objection, leading.
>
> Q: Okay. When did she tell you that?
> **A: Before I came in, I don't know exactly the
> date, but it was before I came in for me to
> have a meeting with her.**

ECF No. 38-1, PageID.1557

Defendant argues this passage should be stricken because it was

Plaintiff's counsel, not Plaintiff, testifying via inappropriately leading

questions.  ECF No. 40, PageID.2018.  The court in this posture can

only consider evidence that would be admissible at trial.  *Alpert v.*

*United States*, 481 F.3d 404, 409 (6th Cir. 2007).  The court is cognizant

52

that "[t]he proffered evidence need not be in admissible form, but its content must be admissible." *Bailey v. Floyd County Board of Education*, 106 F.3d 135, 145 (6th Cir. 1997).  Defendant has objected that the content of these answers would not be admissible if the court sustained the objection to the leading question.

It is true that some district courts have considered it a matter of their discretion to consider, or refuse to consider, deposition testimony at summary judgment that was obtained by leading questions from a friendly witness.  *See Hall v. City of Philadelphia*, No. CV 23-1381, 2024 WL 3937564, at *2-3 (E.D. Pa. Aug. 26, 2024) (striking plaintiff's deposition testimony that resulted from his counsel's leading questions and declining to consider the same in deciding defendants' motion for summary judgment); *Caso v. Luzerne Cnty.*, No. 3:13-CV-02253, 2015 WL 4877817, at *1–2 (M.D. Pa. Aug. 13, 2015) (same).  And in that vein, some have refused to consider those deposition excerpts.  *Compare Hall*, 2024 WL 3937564, *and Caso*, 2015 WL 4877817, *and Wilson v. Frito-Lay N. Am., Inc.*, 260 F. Supp. 3d 1202, 1210 (N.D. Cal. 2017) (excluding answers to "improper leading questions of a non-hostile witness" from consideration on a motion for summary judgment), *with*

53

*Anderson v. SeaWorld Parks and Entm't, Inc.*, No. 15-cv-02172-JSW, 2018 WL 1981396, at \*4 n.3 (N.D. Cal. Feb. 20, 2018) (admitting testimony elicited by a leading question on a motion for summary judgment), *and Canter v. Hardy*, 188 F. Supp. 2d 773, 786 (E.D. Mich. 2002) (finding that although counsel "facilitated [the witness'] statement by posing to her specifically worded, leading questions[,]" her "credibility in general and the reliability of the statements in particular, ultimately the factors go to the weight to be given them by the jury"). The court considers the testimony here because it finds the underlying content could be elicited with less leading questions at trial.[33]  In addition, other testimony lends some support to the idea that Autokiniton was aware that Huston came into the job fresh off an injury that prevented her doing certain tasks.  *See* ECF No. 29-11, PageID.412 (indicating that what actually happened was that Autokiniton withheld

---

[33] Whether this inquiry actually is a matter of the court's discretion is unclear.  *See Jones v. Producers Serv. Corp.*, 95 F.4th 445, 453 (6th Cir. 2024) (though in dicta, stating, "Although plaintiffs argue that this testimony was vague or elicited by leading questions, we must not weigh the evidence and resolve these arguments at the summary judgment stage."); *see also Celotex Corp.*, 477 U.S. at 324 (explaining that on summary judgment, the nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment").  Since the court considers the testimony here, that question does not affect the outcome.

clearance to work until her doctor signed off that she was cleared to work).

Because the court considers the content of that testimony admissible, there is a material dispute of fact whether Autokiniton required Huston to provide a "no restrictions" doctors note while knowing that Huston in fact was (and remained) disabled and had physical limitations preventing her from being able to perform certain tasks.[34]  If Autokiniton fired Huston for refusing to work an area she was allegedly physically unable to work, this physical limitation was known to Autokiniton despite her paperwork on file, and they refused to explore reasonable accommodations in the role, a reasonable jury could conclude that they failed to meet their obligations under the ADA.

---

[34] Admittedly, Huston's testimony at times appears internally contradictory. *See* ECF No. 38-1, PageID.1556 (testifying that Gault told her the note with restrictions "would work").  Her testimony can also be read to simply say she needed to provide a doctor's note in order to obtain an accommodation, or that she chose to get the "no restrictions" note on her own.  And if that turns out to be the case, Huston's case would likely falter.  *See Brumley v. United Parcel Service, Inc.*, 909 F.3d 834, 841 (6th Cir. 2018) (summary judgment for the defendant affirmed where the employee submitted medical forms to support lifting restrictions, then voluntarily abandoned the interactive process by having her doctor remove the restrictions and returning to work without restrictions); *Tchankpa v Ascena Retail Group, Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) (summary judgment affirmed where paperwork submitted by employee's doctor confirmed he could work without an accommodation).  But on the evidence available, which of these options is the best reading of that testimony and/or credibility determination is properly a question for a jury.

e.     *Conclusion*

Thus, Huston has sufficiently shown that there are material disputes of fact regarding whether she sufficiently made a request for accommodation after being assigned to the CR area or whether Autokiniton knew or should have known she had a disability that prevented her lifting the rails, and that they then failed to explore reasonable accommodations.

Generally, ADA and PWDCRA claims are analyzed identically. *Hrdicka v. General Motors, LLC,* 63 F.4th 555, 566 (6th Cir. 2023).  The motion for summary judgment is therefore **DENIED** as to Huston's failure to accommodate claims (Counts VI and VII).

## D.     Race Discrimination (Counts XIII and IX)

Huston also brings two claims of race discrimination: one under 42 U.S.C. § 1981, and one under the ELCRA.

Reflecting the confusing nature of Plaintiff's briefings and arguments, Plaintiff says Count XIII[35] regards her rights under "the First Amendment and the Civil Rights Act of 1866, 42 USC § 1981, as

---

[35] Count XIII is not numbered, but appears between Counts VII and IX.  *See* ECF No. 1, PageID.14.

amended by the Civil Rights Act of 1991." ECF No. 1, PageID.15. It is

hard to say what Plaintiff meant by that, because she brings no claim

under 42 U.S.C. § 1983, makes no First Amendment argument

anywhere in her briefing, and a First Amendment claim is not properly

brought under § 1981. Although she says this count is brought under

§ 1981 and her Complaint addresses only "§ 1981, as amended by the

Civil Rights Act of 1991," (ECF No. 1, PageID.14), all of her cited cases

are Title VII cases. *See* ECF No. 38, PageID.1511-12. Further

complicating matters, although her Complaint calls Count XIII a

"retaliation" claim, her actual arguments in response to the motion for

summary judgment treat it only a "race discrimination" claim, which is

a different framework. *See id.* Plaintiff appears to believe that she

brought a Title VII race discrimination claim (ECF No. 38,

PageID.1512), though the court reads no such claim in her complaint

and Defendant did not indicate they thought that such a claim was

brought. *See* ECF No. 29, PageID.256.[36]

---

[36] *See also* ECF No. 38-1, PageID.1689 (EEOC charge, not checking the box for "race" but only for "retaliation").

However, because Plaintiff analyzes her § 1981 claim as a discrimination claim rather than a retaliation claim, and Defendant appears to respond to that argument in their reply briefing, the court analyzes it accordingly.[37]  And discrimination claims raised pursuant to section 1981 are governed by the same legal framework used to analyze claims under Title VII of the Civil Rights Act of 1964, so the court will apply that framework.  *See Williams v. Zurz*, 503 F. App'x 367, 374 (6th Cir. 2012) (citing *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (applying the Title VII framework to section 1981 claims)).

A plaintiff can prove discrimination through direct or circumstantial evidence.  *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (citing *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003)).  When a plaintiff uses circumstantial evidence, the court applies the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Id.*  To establish a *prima facie* case of race discrimination, a plaintiff must show that (1) she is a member of a

---

[37] *See* ECF No. 40, PageID.2020-21 (Defendant's reply brief).  In this posture, any claim of retaliation on the basis of racial animus under § 1981 has been abandoned by Plaintiff for failure to raise it or develop it in response to the motion for summary judgment.

protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she was replaced by someone outside the protected class or treated differently from similarly situated, nonprotected employees. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 589 (6th Cir. 2014). To show that she was treated differently than similarly situated employees for the same or similar conduct, a plaintiff must show that "all relevant aspects" of her employment are "nearly identical" to those of the allegedly similarly situated employees. *Id.* If a plaintiff establishes a *prima facie* case, a presumption of discrimination arises. The burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Hazle v. Ford Motor Co.*, 464 Mich. 456, 464 (2001). At the pretext stage, a court cannot second-guess an employer's business judgment; the only requirement is that the decision was not motivated by unlawful discrimination. *Hazle* at 475-476.

Plaintiff fails to establish a prima facie case because she identifies no similarly situated comparators who were treated differently with the requisite specificity. Plaintiff's response reads as follows:

59

> Plaintiff has produced a wealth of circumstantial evidence showing that race played a role in her termination: 1) She was one of three Black women terminated within a short period, all of whom were connected in some way to her sister, Tiara Williams—a fellow Black woman who had recently filed a sexual harassment complaint against the plant manager, James Pace; and 3) [sic] testimony from Plaintiff and Tiara Williams establishes a broader pattern of discriminatory treatment of Black women at Autokiniton, including being disbelieved when reporting misconduct and facing retaliation, including termination, when raising concerns.

ECF No. 38, PageID.1512-13.

First, Plaintiff cites to no record evidence at all for this set of assertions, and it is not the court's job to go looking through the voluminous record to find support for her arguments on her behalf. *Magnum Towing & Recovery v. City of Toledo*, 287 F. App'x 442, 449 (6th Cir. 2008); *Drews v. Am. Airlines, Inc.*, 68 F. Supp. 3d 734, 739 (E.D. Mich. 2014) ("[T]he trial court is not required to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'") (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989)).

Second, the majority of Williams' "testimony" that Huston appears to reference in her response are allegations from Williams' complaint.

60

*See* ECF No. 38, PageID.1503 (citing only Williams' complaint as evidence). But that complaint was not verified, so it is not evidence and is inadmissible at summary judgment in this case. *See* Case No. 23-cv-12404, ECF No. 1 (Williams' Complaint); *King v. Harwood*, 852 F.3d 568, 578 (6th Cir. 2017) (allegations in an unverified complaint are not admissible evidence). Huston's sole record citation in her race discrimination argument is that "Pace [the plant manager] sought to get rid of Black women who could support Tiara Williams' claims against him." ECF No. 38, PageID.1513-14 (citing Huston Dep. at 145:4-147:13). Fair enough; in the cited portion of Huston's deposition, she states that one of Williams' friends (also a Black woman) was fired; according to Huston, it was also because that person was Black. *See* ECF No. 38-1, PageID.1554-55. But as explained above, Huston's speculation about why that unidentified third person was fired (before Huston herself started work at Autokiniton) is insufficient to create a genuine dispute of fact, at least absent some proof that Huston had personal, non-hearsay knowledge of the reasons for that person's termination. Further, these statements regarding this unidentified individual are still not sufficient to identify non-Black comparators to

61

create a causal inference between Huston's termination and race discrimination. *See Webster v. Target Corp.*, No. 22-11293, 2024 WL 4063907 at \*4 (E.D. Mich. June 27, 2024) (dismissing ELCRA claim where Webster failed to identify proper comparators because his claim that a disproportionate number of terminations were minority employees did not establish comparators with his same supervisor who engaged in similar conduct, but were not disciplined); *Johnson v. Aston Carter, Inc.*, No. 22-10025, 2024 WL 1317777 at \*6 (E.D. Mich. March 27, 2024) (same). Huston does not identify any non-Black person who engaged in similar conduct to her but was not fired. Nor does Huston explain how her supervisor (rather than Pace) discriminated against her or other Black individuals; Pace himself was not Huston's supervisor. ECF No. 38-1, PageID.1526. As previously explained, there is no evidence at all that Pace was actually involved in Huston's termination.

Finally, even assuming that Huston has met her burden of a prima facie case, none of Huston's arguments regarding pretext establish that the employer's proffered reason for terminating her was pretext for *racial* discrimination as opposed to other discriminatory

reasons. For example, Huston's argument that "she left the assigned CR area because she could not safely perform the task due to a disability, and that she informed supervisors and union reps accordingly" is an argument that this was *disability*-based retaliation, not racial. *See* ECF No. 38, PageID.1513. Her argument that Autokiniton failed to follow its progressive discipline policy when terminating her does not raise an inference of racial discrimination absent proof that Defendant was following the progressive discipline policy for non-Black probationary employees. *See* ECF No. 38, PageID.1513. And while Huston focuses on Pace's alleged desire to terminate persons associated with Williams' sexual harassment complaint, by the terms of Huston's own theory, that was also not motivated by race discrimination. Diane Maccani, the original HR rep who investigated Williams' claim, and one of only four women fired under this theory, is not Black. ECF No. 38, PageID.1514; *see id.* at PageID.1512 (the three Black women were Huston, Williams, and Williams' unidentified friend). Accepted as true, her argument would only establish that Maccani and Huston were fired as part of a conspiracy by Pace because they were in some way connected to

63

Williams' sexual harassment claims, which (absent any proof of racial animus or similarly situated comparators) sounds in retaliation for reporting sexual harassment, not in race discrimination. Summary judgment is appropriate as to Count XIII.

As to her state law claim, "[c]laims of race discrimination brought under the ELCRA are analyzed under the same standards as claims of race discrimination brought under Title VII." *Dotson v. Norfolk S. R.R. Co.*, 52 F. App'x 655, 657 (6th Cir. 2002) (citing *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999)). Because Huston's claims are dismissed under § 1981, which is analyzed under the same framework as Title VII, so too are her state law race discrimination claims under the ELCRA (Count IX).

### E.    Misrepresentations to the court

Finally, a note on Plaintiff's counsel's conduct in this case is warranted. In both this case and the related case, Plaintiff's counsel filed a motion to file a corrected response brief, because she did not properly include a counter-statement of facts in her response to the motion for summary judgment, per the undersigned's practice guidelines. The written motion was brought in *Williams* (the

64

companion case), but at a status conference for both cases, counsel (Ms. Aikens) requested leave to make the same corrections in *Huston* (this case).  The court took counsel at her word that the same motion applied to both cases and that the motions were in substance identical.  She thus, as the court understood it, sought leave to file a "corrected" brief in which, as Plaintiff represented in writing to this court in *Williams*, "no substantive arguments or exhibits have changed."  In her words: "Plaintiff has [] revised only the 'Response to Defendant's Statement of Material Facts' section of her filing to conform to this requirement.  The Argument section of Plaintiff's brief remains unchanged, so as not to prejudice Defendant."  Case No. 23-cv-12404, ECF No. 51, PageID.1110. The court thus granted leave to file a corrected response.

But counsel's promises were not true.  Nor, for that matter, is Plaintiff's statement in her own brief *in this case* that "Plaintiff has corrected improper citations from the prior version" and nothing else. ECF No. 38, PageID.1488.  *Compare*, for example: ECF No. 33, PageID.949 (original brief's retaliation argument) with ECF No. 38, PageID.1506 ("corrected" brief's retaliation argument, citing new cases and deleting citations from the original).  *And see*: ECF No. 33,

PageID.954-56 (original brief's response on race discrimination claims);

ECF No. 38, PageID.1511-14 ("corrected" brief with almost entirely new

argument and structure). The court is frustrated by counsel's inability

or unwillingness to follow through on promises made to the court, and

by counsel's misrepresentations to the court regarding the "corrected"

brief. Granted, the court preemptively granted Defendant another

chance to file a reply, and Defendant did so and therefore had the

opportunity to respond to these new arguments. Any prejudice to

Defendant was limited to the cost of their time. Nonetheless, Plaintiff's

counsel's addition of new argument – when no such leave was granted

or intended to be granted – frustrates the orderly administration of

justice, required additional unwarranted work by Defendant and this

court, and was contrary to the spirit and letter of the court's order.

Because Defendant responded in full to the "corrected" brief and

Plaintiff's claims should not be prejudiced by her counsel's actions, the

court has reluctantly addressed the merits of the "corrected" response

briefs and treat them as operative in this opinion and order. Ms.

Aikens is warned that, in the future, the court may instead strike any

66

kind of "corrected" pleading that adds material in this way, and deal only with the original submission.

That is not all, however.  The court must also address counsel's substantive misrepresentations made on behalf of her client.  First: at one point, Plaintiff states that "HR Generalist Kimberly Gault acknowledged that Plaintiff had been accommodated at the time of hire by being placed in a light-duty assignment, contradicting Defendant's claim that no accommodation was needed."  ECF 38, PageID.1493 (citing Gault's Deposition, ECF No. 38-3, PageID.1847-48, 9:3-10:15). This misrepresents the cited portions Gault's testimony, which had nothing to do with this issue.  The court has reviewed Gault's deposition transcript and is not aware of any testimony by Gault regarding Huston being placed in a "light duty" assignment for purposes of accommodation.  *See also* ECF No. 38-3, PageID.1860-61 (when Gault was asked if she was aware if Huston had ever requested an accommodation, she answered: "No.").

Second: Plaintiff argued that "[e]ven Maccani herself could not rule out that this [Williams' termination] was the motivation for her [Maccani's] termination."  ECF No. 38, PageID.1514.  That statement

misrepresents the testimony in Maccani's deposition; Maccani said her termination did not have to do with Williams' termination. *See* ECF No. 38-2, PageID.1752 (Maccani's deposition) (Plaintiff's counsel: "Did you think it [being let go] had anything to do with Ms. Williams' investigation?" Maccani: "No." . . . Counsel: "so you're saying that you didn't think that there was a connection between those two things." Maccani: "No I did not.").[38] Plaintiff's description of this testimony does not read as mere puffery; rather, it reads as an attempt to mislead the court. *See Kellar v. Yunion, Inc.*, No. 25-1136, Doc. 34-2 (6th Cir. 2025) (making a similar warning to Aikens).

Third, Plaintiff's brief "denies" a number of statements of fact while either citing to no contrary factual evidence or by citing to evidence that does not provide the support she says. The court has noted some of those instances above. Unnecessary or improper denials waste the court's time by forcing the court to review underlying testimony or other evidence that does not materially dispute the facts at issue. The court seriously questions whether these denials comported

---

[38] *See also Williams v. Autokiniton*, No. 23-12404, ECF No. 39-12, PageID.461 (testimony of Ryan Hernandez that Maccani was terminated for performance-related reasons).

with counsel's obligations under Rule 11. *See Pemberton v. Bell's Brewery, Inc.*, 150 F.4th 751, 769 (6th Cir. 2025) (warning Aikens that sending the court on a wild "goose chase" for nonexistent evidence is in fact a "serious and active misstatement[] of the record.").

Aikens has an obligation to advocate with candor. *E.g.*, Model Rules of Professional Conduct r. 3.3(a) (A.B.A. 2025). The court questions whether she upheld this obligation in her briefings before this court. *See Kellar v. Yunion, Inc.*, No. 25-1136, 2025 LX 575135, at *5 (6th Cir. Dec. 18, 2025) (warning Aikens that warned that her attempts to mislead the court "undermine[] the integrity of the litigation process" and referring her for sanctions). This once, in this set of companion cases, and absent a motion by the Defendant for sanctions, the court will not order Ms. Aikens to show cause why sanctions should not be imposed. But the court warns Aikens that in the future, similar conduct may well incur sanctions, including dismissal of the offending brief and forfeiture of the right to file a correction, and/or monetary sanctions for misrepresentations of the record.

## V.  CONCLUSION

69

For the reasons stated above, the court **GRANTS** the motion for summary judgment (ECF No. 29) as to Counts I, II, III, V, XIII, and IX, but **DENIES** the motion as to Counts VI and VII for failure to accommodate.

**SO ORDERED**.


Date: March 16, 2026                          s/F. Kay Behm
                                              F. Kay Behm
                                              United States District Judge